## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | | |
|---|---|---|---|
| DEBORAH MUTTS, | : | | |
| | : | | |
| Plaintiff, | : | NO. | 3:04cv1746 (MRK) |
| | : | | |
| v. | : | | |
| | : | | |
| SOUTHERN CONNECTICUT STATE | : | | |
| UNIVERSITY | : | | |
| Defendant. | : | | |

## MEMORANDUM OF DECISION

In this employment discrimination action, Plaintiff Deborah Mutts asserts claims against Defendant Southern Connecticut State University ("SCSU" or the "University") for employment discrimination and retaliation in violation of the Americans with Disabilities Act of 1990, Section 504 of the Rehabilitation Act of 1973, and Title VII of the Civil Rights Act of 1964, as well as state law claims for intentional and negligent infliction of emotional distress.  Defendant SCSU has moved for summary judgment on the entirety of Mrs. Mutts' Complaint. For the reasons explained below, the Court GRANTS Defendant's Motion for Summary Judgment [doc. # 27] and enters judgment for SCSU on all of Mrs. Mutts' claims.

## I.

The summary judgment standard is a familiar one.  Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(b).  A genuine issue of fact exists when "a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.' " *Holtz v.*

*Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A]ctual disputes that are irrelevant or unnecessary will not be counted." *Anderson*,  477 U.S. at 248. The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and the Court must draw all ambiguities and inferences in favor of the plaintiff, *see Anderson*, 477 U.S. at 255.  Although courts must exercise caution in granting summary judgment to the defendant in employment discrimination cases where the employer's intent is in question, *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997), "[s]ummary judgment is appropriate even in discrimination cases," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).  "[S]ummary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial," *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 54 (2d Cir. 1998), but "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp*, 118 F.3d at 110. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50.  In brief, to survive summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997).

## II.

The following forms the factual background to Mrs. Mutts' Complaint. As is required on a motion for summary judgment, the Court relates the facts in the light most favorable to Mrs. Mutts. Mrs. Mutts is a former custodial worker at SCSU. She was hired in 1998 and received consistently

satisfactory work evaluations. She suffers from chronic asthma, a condition of which she informed SCSU in 2000. Also relevant to Mrs. Mutts' Complaint are the facts that she is a white woman married to black man, that she and her husband were both employed at SCSU, and that in March 2003, her husband filed a CHRO complaint against SCSU alleging race discrimination – an administrative grievance that became a federal lawsuit in July 2004.  Mrs. Mutts stopped going to work at SCSU in December 2003 due to work-related depression. Her allegations of discrimination fall into five groups.

First, in March 2003, SCSU reassigned Mrs. Mutts' to another area of the University, the Residence Halls. Mrs. Mutts objected to the move because the chemicals required to clean that part of the University aggravated her asthma. Accordingly, SCSU transferred her back to the Buley Library ("Buley"). Mrs. Mutts does not allege that the reassignment to the Residence Halls or the transfer back to Buley was discriminatory. *See* Plaintiff's Local Rule 56 a(2) Statement [doc. #31] ¶¶ 12, 13, 15,16. Rather, Mrs. Mutts alleges that after her return to Buley, she was required to take sole responsibility for cleaning an area that had previously been assigned to two employees, and that SCSU ignored her objections to the resulting impossible workload, denied her the additional assistance or overtime necessary for her to properly complete her tasks, left her areas uncleaned while she was out for a week on sick leave, and refused to allow her to come to work earlier than usual in order to have time to do a thorough job, despite the fact that other workers were allowed to do so.  *See* Complaint [doc. # 1] ¶¶ 9, 10, 13.

Second, Mrs. Mutts asserts that, in November 2003, she began to have problems with a night-supervisor who was verbally abusing her on the basis of her mixed-race marriage, her family and her history of breast cancer. Mrs. Mutts alleges that SCSU ignored her complaint about this problem and allowed the alleged abuse to continue unchecked. When SCSU did offer a meeting to

discuss the matter, the University refused to allow Mrs. Mutts to have a union representative present, and Mrs. Mutts therefore declined to attend.  *See* Complaint [doc. # 1] ¶ 15.

Third, Mrs. Mutts relates that, in November 2003, despite knowing of her asthmatic condition, SCSU required Plaintiff to clean up debris full of mold that had been left by workers called in to eliminate a mold problem in one of the rooms.  *See* Complaint [doc. # 1] ¶ 12.

Fourth, Mrs. Mutts alleges that, despite its knowledge of her asthma, SCSU required her to shovel snow during the winter months rather than providing her with reasonable accommodation for her disability.  *See* Complaint [doc. # 1] ¶ 11.

Fifth, Mrs. Mutts complains that SCSU took three months to respond to a written complaint about her difficulties at work, sent to the University after she left work and did not return in December 2003.  *See* Complaint [doc. # 1] ¶ 18.

### III.

SCSU has moved for summary judgment on the ground that Mrs. Mutts' claims are either barred by sovereign immunity or fail because she cannot make out a *prima facie* case under the applicable law. The Court addresses first, as it must,  the threshold issue of sovereign immunity, and then analyzes the non-jurisdictional challenges to each remaining claim.

A.    Sovereign Immunity

As a preliminary matter, Mrs. Mutts concedes that her state law claims for intentional and negligent infliction of emotional distress are barred by the doctrine of sovereign immunity.  *See* Plaintiff's Motion in Opposition to Summary Judgment [doc. # 30] at 13.  Accordingly, Counts IV and V of the Complaint [doc. # 1] must be dismissed for lack of subject matter jurisdiction.

Sovereign immunity is likewise fatal to Count II, in which Mrs. Mutts alleges that SCSU

discriminated against her on the basis of her asthmatic condition in violation of Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12111-12117. The issue was conclusively decided by the Supreme Court in *Bd. of Trustees v. Garrett*, 531 U.S. 356 (2001), which held that Title I of the ADA (governing employment) does not validly abrogate states' Eleventh Amendment immunity. *See Garrett*, 531 U.S. at  374; *see also Garcia v. SUNY Health Sciences Center*, 280 F.3d 98, 108 (2d Cir. 2001).[1]  Accordingly, Count II of the Complaint must also be dismissed for lack of subject matter jurisdiction.

SCSU argues that Count III – alleging disability discrimination under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 – is similarly barred by sovereign immunity. Relying on the Second Circuit's decision in *Garcia*, SCSU asserts that "it is clearly established that claims under the Rehabilitation Act are barred by the Eleventh Amendment." *See* Memorandum in Support of Summary Judgment [doc. # 27] at 9.  However, SCSU's argument ignores the fact that, unlike the ADA, the Rehabilitation Act was enacted pursuant to Congress's authority under the Spending Clause of Article I, and that the Act contains a section providing that "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal Court for a violation of Section 504 of the Rehabilitation Act of 1973."  42 U.S.C. § 2000d-7.  As the Second Circuit has explained, this provision "constitutes a clear expression of Congress's intent to condition acceptance of federal funds [under the Rehabilitation Act] on a state's waiver of its

---

[1] Plaintiff does not contest that SCSU is an arm of the state for purposes of the Eleventh Amendment. *See, e.g.*, *Garcia*, 280 F.3d at 107 ("[F]or Eleventh Amendment purposes, SUNY is an integral part of the government of the State [of New York] and when it is sued the State is the real party." (internal quotation marks omitted)); *Brown v. Western Connecticut State University*, 204 F. Supp. 2d 355, 361 (D. Conn. 2002) ("From the Court's review of the relevant case law and Connecticut statutes, it appears that the Connecticut state universities are entitled to claim immunity under the Eleventh Amendment analysis.").

Eleventh Amendment immunity." *Garcia*, 280 F.3d at 113.

It is true that in *Garcia* the Second Circuit determined that New York nonetheless enjoyed sovereign immunity from Garcia's suit under the Rehabilitation Act. *See id.* at 114. But the basis of that conclusion was that, because New York had accepted federal funds at a time when "by all reasonable appearances state sovereign immunity had already been lost" due to the then-prevailing (though ultimately erroneous) understanding that sovereign immunity had already been abrogated by Title II of the ADA, it had not thereby *knowingly* waived its sovereign immunity. *See id.* ("[A]n effective waiver of sovereign immunity requires an intentional relinquishment of a *known* right" (internal quotation marks omitted)). No state can labor under a similar misapprehension after *Garcia*, for in that decision the Second Circuit expressly held that Title II of the ADA generally exceeded Congress' powers under Section 5 of the Fourteenth Amendment. *Id.* at 110.

Therefore, if a state accepts federal funds under the Rehabilitation Act *after Garcia*, it necessarily follows from that decision that the state has knowingly waived its Eleventh Amendment sovereign immunity with respect to Section 504 claims that arose (as here) after the *Garcia* decision. *See, e.g., id.* n.4 ("[I]f there is a colorable basis for the state to suspect that an express congressional abrogation is invalid, then the acceptance of funds conditioned on the waiver might properly reveal a knowing relinquishment of sovereign immunity."); *Degrafinreid v. Ricks*, 417 F. Supp. 2d 403, 414 (S.D.N.Y. 2006) ("Under the logic of *Garcia* and the cases interpreting its decision on waiver, New York's continued acceptance of federal funds on behalf of DOCS constitutes a waiver of sovereign immunity as to all of plaintiff's Rehabilitation Act claims."); *Blasio v. N.Y. Dep't Corr. Serv.*, No. 04-CV-653(S), 2005 WL 2133601 at *3 (W.D.N.Y. Aug. 31, 2005) ("By continuing to accept federal funds after *Garcia*, however, New York knowingly waived its immunity for Rehabilitation Act claims, which are based on post-*Garcia* events.").

6

Although neither party briefed the fact and timing of SCSU's acceptance of federal funds in the period after *Garcia*, the Court raised this issue at oral argument. In response to the Court's inquiries, counsel for SCSU conceded that "it's appropriate to assume that Southern has continued to receive federal financial funds" under the Rehabilitation Act since the Second Circuit's decision in *Garcia*. In view of the State's acceptance of federal funds under the Rehabilitation Act since the decision in *Garcia*, as well as the fact that Mrs. Mutts' claims in this action arose after *Garcia*, and in the absence of any basis asserted by SCSU for concluding that the State did not intentionally and knowingly waive its Eleventh Amendment immunity when it accepted the funds conditioned on a waiver, the Court concludes that the State has waived its Eleventh Amendment immunity with respect to Mrs. Mutts' claims under Section 504. *See Garcia*, 280 F.3d at 114 n.4. Accordingly, the Court has subject matter jurisdiction over that claim.

B.      Count III: Disability Discrimination in Violation of the Rehabilitation Act

In Count III, Mrs. Mutts asserts that she was discriminated against on the basis of her asthma in violation of Section 504 of the Rehabilitation Act. To establish a *prima facie* violation of Section 504, Ms, Mutts must demonstrate, *inter alia*, that she is a "qualified individual[] with a disability," and that she was "denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or w[as] otherwise discriminated against by defendants, by reason of [her] disabilit[y]." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003). As explained below, the Court concludes that Mrs. Mutts' asthmatic condition does not qualify her as disabled within the meaning of the Rehabilitation Act. As a consequence, Mrs. Mutts has failed to establish a *prima facie* case of disability discrimination, and SCSU is entitled to summary judgment on her Section 504 claim.

7

The parties agree that, in order to qualify as an individual with a disability within the meaning of Section 504, Mrs. Mutts must show that her condition amounts to a substantial limitation on a major life activity. *See, e.g.*, *Weixel v. Bd. of Ed. of the City of New York*, 287 F.3d 138, 147 (2d Cir. 2002).  Mrs. Mutts claims that her asthma substantially impairs her in the major life activities of breathing and performing manual tasks.

Determining whether asthma constitutes a substantial restriction on a major life activity ordinarily is highly context-dependent.  In the context of the Rehabilitation Act and the ADA, which have virtually identical "reach and requirements," *Weixel*, 287 F.3d at 146 n.6, the case law indicates that simply suffering from asthma does not constitute a substantial limitation on the major life activity of breathing. Rather, asthma has been held to give rise to a substantial limitation on the major life activity of breathing only where the plaintiff has a long history of asthmatic attacks and endures numerous and severe restrictions on daily activities as a result of the condition. *See, e.g.*, *Albert v. Smith's Food & Drug Centers, Inc.*, 356 F.3d 1242, 1245 (10th Cir. 2004) ("Since early childhood, [Plaintiff's] asthma has limited her activities. She has been instructed by her doctors to avoid crowds, cigarette smoke, people wearing perfume, and outdoor activities. She must avoid being active at night, remain indoors during windy conditions and cannot be in enclosed spaces with cleaning agents . . . [E]ven with . . . medications she experiences symptoms most of the time."); *Guess v. Pfizer, Inc.*, 971 F. Supp. 164, 169  (E.D. Pa. 1996) (Plaintiff had "taken medication for his asthma on a daily basis for as long as he can remember," "had 1-2 asthma attacks a day," which were triggered by "[e]ven minor instances of physical exertion," and "force[d] him to avoid certain pets, cigarette smoke, perfume, and fresh paint.").  Where, by contrast, a plaintiff suffers asthma attacks only in response to particular stimuli and is able to engage in almost all normal life activities, courts have been disinclined to conclude that the plaintiff is substantially limited in the major life activity

8

of breathing. *See, e.g.*, *Muller v. Costello*, 187 F.3d 298, 314 (2d Cir. 1999) (plaintiff's "substantial physical activity without encountering debilitating allergens cuts against his claim of disability. Simply put, there is not enough evidence of off-the-job breathing problems to find a substantial limitation of that life activity."); *Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 723 (2d Cir. 1994) (concluding that, despite respiratory problems at work, plaintiff's "ability to breathe restricted her only in a limited way, and did not bar her from exercising."); *Droutman v. New York Blood Center, Inc.*, No. 03-CV-5384 (DRH/ARL), 2005 WL 1796120 at *6 (E.D.N.Y. July 27, 2005) (Plaintiff's "ten or so asthma attacks were apparently limited to her working environment, self-medicated with an inhaler, and mitigated by breathing exercises and movement to an area of fresh air. [Plaintiff] was also generally capable of performing her job assignments [and] thus did not have a 'disability' as defined by the ADA.").

In this case, Mrs. Mutts has not presented any evidence that she developed her asthmatic condition as a child, rather than as an adult, or that she has been told by doctors to avoid stimuli other than exposure to multiple chemicals in enclosed spaces, or that her asthma is triggered by ordinary activity as opposed to prolonged or intense physical exertion. Furthermore, as she testified at deposition, she is able to smoke without aggravating her condition. *See* Deposition of Deborah Mutts at 80, Ex. A to Defendant's Motion for Summary Judgment [doc. # 27].  Thus, Mrs. Mutts' asthma condition is quite distinguishable from those cases in which courts have found asthma to be substantially limiting.  On the basis of the account of the history and nature of her asthmatic condition presented in Mrs. Mutts' own submissions, the Court concludes that no reasonable jury could find that Mrs. Mutts' asthma substantially limits her in the major life activity of breathing. *See, e.g.*, *Heilweil*, 32 F.3d at 724 (affirming summary judgment); *Droutman*, 2005 WL 1796120, at * 6 (granting summary judgment).

9

As to Mrs. Mutts' assertion that her asthma substantially limits her in the major life activity of working – in this case performing manual labor – this allegation is refuted by her claims in this lawsuit. For one, Mrs. Mutts' own Complaint states that "[e]ven *without* accommodation, the plaintiff was capable of reasonably performing her duties as evidenced by her successful employment with the defendant." Complaint [doc. # 1] ¶ 29 (emphasis in original). This statement in her pleading constitutes a "judicial admission[] by which [Mrs. Mutts] [i]s bound throughout the course of the proceeding." *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (internal quotation marks omitted). Furthermore, Mrs. Mutts' deposition testimony makes it clear that when she requested help with the workload in Buley, the basis for her request was that she was "flipping her lid" from the stress of trying to do a good job without enough assistance, not that the work was aggravating her asthma. Deposition of Deborah Mutts at 76, Ex. A to Defendant's Motion for Summary Judgment [doc. # 27]. Therefore, the Court concludes that no reasonable jury could find that Mrs. Mutts' asthma substantially limits her in the major life activities of working or breathing. Accordingly, SCSU is entitled to summary judgment on Count III of Mrs. Mutts' Complaint.


C.    Count I: Disability Discrimination and Retaliation in Violation of Title VII

The Court turns next to Count I, in which Mrs. Mutts alleges that SCSU violated Title VII by discriminating against her on the basis of her asthmatic condition and retaliating against her for a discrimination complaint filed by her husband and co-worker, James Mutts.

*1. Disability Discrimination and Associational Race Discrimination*

The first part of Count I, alleging discrimination on the basis of disability, fails because disability is not one of the cognizable grounds for a Title VII action. *See* 42 U.S.C. 2000e-2(a)(1)

10

("it shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin."). Perhaps anticipating this ruling, Plaintiff insists in her Opposition to Summary Judgment [doc. # 30] that she has stated a claim under Title VII for "associational race discrimination" based on her marriage to a black man.

The problem for Mrs. Mutts is that this race-based claim was neither raised with the EEOC, nor pled in her Complaint. On her EEOC complaint, Mrs. Mutts did not check the available boxes for discrimination based on race, national origin, or marital status. Of course, it is the substance of the EEOC complaint that ultimately controls, not the boxes checked. *See Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003). However, the only reference to race in Mrs. Mutts' EEOC complaint is found in paragraph 13, in which Mrs. Mutts states that she had problems with a supervisor who made derogatory comments about her medical condition and "about her family which happened to be of a mixed racial background." Affidavit of Illegal Discrimination by Deborah Mutts ¶ 13, Exhibit E to Plaintiff's Opposition to Summary Judgment [doc. # 30]. This passage does not indicate that the complained of commentary had anything to do with Mrs. Mutts' marriage. Indeed, it is only in Count II of the EEOC complaint (for retaliation based on opposition to discrimination) that Mrs. Mutts even mentions the race of her husband. Furthermore, paragraph 22 of Ms. Mutt's EEOC complaint makes it clear that the only two grounds for that complaint are that she was discriminated against on the basis of her physical disability and her husband's open opposition to discrimination. *Id.* ¶ 22. Similarly, paragraph 23 of Mrs. Mutts' Complaint characterizes her EEOC complaint as "alleging discrimination by defendant due to plaintiff's physical disability, as well as retaliation for the complaint her husband filed against the defendant." Even in view of the "loose pleading" requirement for EEOC charges, *Deravin*, 335 F.3d at 201, the Court is doubtful that Mrs. Mutts'

11

claim of associational race discrimination can reasonably be said to "fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Id.*

However, even assuming that the passing reference in the EEOC complaint to derogatory comments based on the mixed racial background of her family were sufficient for purposes of administrative exhaustion, Mrs. Mutts' associational race discrimination claim still fails because it is not pled in her Complaint in this action. Paragraphs 15, 19, 21, 22, 23, 25, 26, 28 and 30 of the Complaint [doc. # 1] all make it very clear that Mrs. Mutts believed that she had been discriminated against on the basis of her disability and because of her husband's open opposition to racial and disability discrimination at SCSU. Just as in her EEOC complaint, the sole basis for Mrs. Mutts' claim to have raised associational race discrimination is a single paragraph asserting that at one point Mrs. Mutts experienced difficulties with a supervisor who "was defaming her name, speaking publicly about her medical condition and about her family which happened to be of a mixed racial background." Complaint [doc. # 1] ¶ 15. Even if this reference is sufficient to satisfy the forgiving pleading requirements of uncounseled EEOC complaints, it is not sufficient to put Defendant on notice of a race-based claim in a civil action in which Mrs. Mutts is represented by competent counsel. In this connection, the Court further notes that in her deposition Mrs. Mutts made no reference to discrimination based on race.  Nor has Mrs. Mutts ever sought to amend her complaint to assert such a claim.  Since it is "inappropriate to raise new claims for the first time in submissions in opposition to summary judgment," *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 170 F.R.D. 111, 119 (S.D.N.Y. 1997), the Court declines to consider Mrs. Mutts' associational race discrimination claim. *See also Beckman v. United States Postal Service*, 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000) (declining to consider claims raised for the first time in opposition to summary

judgment); *Walker v. New York*, No. 98 CV 2695 (SJ), 2002 WL 31051534 at *4 n.3 (E.D.N.Y. July 22, 2002) (same); *Huskins v. Pepsi Cola of Odgensburg Bottlers, Inc.*, 180 F. Supp. 2d 347, 353 (N.D.N.Y. 2001) (same).

   *2. Retaliation*

   The Court turns finally to Mrs. Mutts' Title VII claim for retaliation. Mrs. Mutts asserts that she did not have problems at work until her husband filed a complaint with the CHRO in March 2003, alleging that SCSU had discriminated against him on the basis of his race.[2]  In particular, Mrs. Mutts alleges that SCSU retaliated against her because of her husband's opposition to racial discrimination and that it did so by failing to take action against a supervisor who was making derogatory comments to her about her health and family, by denying her a meeting with union representation to discuss the problem with her supervisor, by assigning her an unreasonable amount of work, and by refusing to reduce that work to accommodate her disability.

   To make out a claim for retaliation, Mrs. Mutts must show that: "(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 608 (2d Cir. 2006). As explained below, the Court concludes that Mrs. Mutts cannot establish a *prima facie* case because she did not personally engage in any protected activity that resulted in retaliatory action.

   Title VII prohibits employers from taking adverse action against an employee "because he

_____

   [2] For clarity, the Court notes that Mr. Mutts' CHRO complaint became a federal lawsuit, but that suit was not filed until July 7, 2004, long after the allegedly retaliatory conduct at issue in this case had already occurred.  It is, therefore, irrelevant to the analysis of Mrs. Mutts' retaliation claim.

13

has opposed any practice made an unlawful employment practice by this subchapter, or because he

has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding,

or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Mrs. Mutts alleges that she was retaliated

against because *her husband* pursued  racial discrimination claims against the defendant. That is,

Mrs. Mutts does not allege any protected activity of her own, but rather claims that the University

retaliated against her as a result of her husband's protected activity.[3]

Courts have split on whether merely being related to another person who engages in

protected activity is sufficient to satisfy the first prong of a *prima facie* case of retaliation. Judge

Gleeson recently catalogued the relevant decisions in *Genao v. New York City Department of Parks*,

No. 04 CV 2893 JG, 2005 WL 1220899 (E.D.N.Y. May 23, 2005).  On the one hand, the Fifth,

Third, and Eighth Circuits have held that such so-called "third-party retaliation claims" are not

cognizable. *See Fogleman v. Mercy Hospital Inc.*, 283 F.3d 561, 568 (3d Cir. 2002); *Smith v.

Riceland Foods, Inc.*, 151 F.3d 813, 819 (8th Cir. 1998); *Holt v. JTM Industries, Inc.*, 89 F.3d 1224,

1226 (5th Cir. 1996).  On the other hand, EEOC case law indicates that "[i]t is well settled that third

party reprisals are cognizable under EEO law," *see, e.g.*, *Bates v. Widnall*, 1997 WL 332902

(E.E.O.C. June 10, 1997), *Alexander v. Whitten Peters*, 1998 WL 201692 (E.E.O.C. Apr. 16, 1998),

---

[3] Although Mrs. Mutts asserted that the University knew she would testify for her husband at his CHRO hearing, and although acting as a witness would itself qualify as protected activity, Ms. Mutt's was not in fact listed as a witness for Mr. Mutts' CHRO hearing, *see Exhibit A to Plaintiff's Supplemental Brief* [doc. # 39]. And although Mrs. Mutts' Affidavit emphasizes that Defendant's representatives were made aware of the fact that she might testify at Mr. Mutts' CHRO hearing "during the CHRO proceedings involving my claims of unfair employment practices," Mutts Affidavit ¶ 4, Exhibit F to Plaintiff's Opposition to Summary Judgment [doc. # 30], this allegation is irrelevant, because Ms. Mutt's own CHRO hearing took place *after* the alleged retaliatory conduct that forms the basis of this action.  Therefore, Mrs. Mutts has not submitted any record evidence that she engaged in any protected activity of her own before the alleged retaliation that is the subject of this action.

14

and a number of district courts, including courts within the Second Circuit, have also expressly endorsed third-party retaliation claims, *see, e.g.*, *Gonzalez v. N.Y. State Dep't. Corr. Serv.*, 122 F. Supp. 2d 335, 346-47 (N.D.N.Y. 2000); *Murphy v. Cadillac Rubber & Plastics, Inc.*, 946 F. Supp. 1108, 1118 (W.D.N.Y. 1996).

Furthermore, it is at least arguable that the EEOC and district court embracing third party retaliation claims are joined in their views by the Sixth, Seventh, and Eleventh Circuits. Although the Seventh Circuit has not explicitly endorsed third party claims in the context of co-worker spouses, it has allowed claims in which "the employer retaliates against the employee for having failed to prevent the filing of a complaint," and has observed that collective punishment or mistaken identity situations also involve "genuine retaliation, and we cannot think of any reason . . . other than pure oversight, why Congress should have excluded them from the protection of the statute." *McDonnell v. Cisneros*, 84 F.3d 256, 262 (7th Cir. 1996).  In the Sixth Circuit, a plaintiff may bring a claim of retaliation based on harm suffered by a co-worker who opposed discrimination on the plaintiff's behalf. *See E.E.O.C. v. Ohio Edison, Co.*, 7 F.3d 541, 545 (6th Cir. 1993).  The Eleventh Circuit has not been squarely presented with the question of whether third-party claims by spouses come within the statutory language, but it has upheld against a challenge on grounds of administrative exhaustion a claim by a husband allegedly retaliated against on the basis of his wife's protected activity. *See Wu v. Thomas*, 863 F. 2d 1543, 1547-48 (11th Cir. 1989). Unfortunately, the Second Circuit "'has not yet decided whether a cause of action exists under Title VII for . . . third-party retaliation claims.'" *Gonzalez*, 122 F. Supp. 2d at 347 (quoting *Thomas v. American Horse Shows Ass'n, Inc.*, No. 99-7662, 2000 WL 232041 at *1 (2d Cir. Jan. 25, 2000)).

The apparent split of authority as to the viability of third-party retaliation claims turns on differing views as to whether the language of the statute, or the policy that courts suppose animates

the statute, should govern. As several courts have pointed out, the plain language of the anti-retaliation provision of Title VII (as well as the ADA and the ADEA) prohibits discrimination only against those who themselves have engaged in protected activity or who have assisted, testified, or participated in a hearing under the anti-discrimination statutes. *See Fogleman*, 283 F.3d at 568 (ADA, ADEA); *Riceland Foods*, 151 F.3d at 819 (Title VII); *Holt*, 89 F.3d at 1226 (ADEA).   As the Third Circuit put it in *Fogelman*: "Read literally, the statutes are unambiguous – indeed, it is hard to imagine a clearer way of specifying that the individual who was discriminated against must also be the individual who engaged in protected activity."  *Fogleman*, 283 F.3d at 568.

Nevertheless, courts have also noted that the policy underlying the retaliation provisions is to encourage employees to engage in protected activity without fear of reprisal and that if employers could retaliate against spouses of employees who engage in protected activity, employees might be deterred from exercising their protected rights.   *See, e.g.*, *id.* at 568-69; *McDonnell*, 84 F.3d at 262; *Gonzalez*, 122 F. Supp. 2d at 347. As the EEOC has expressed the point: "Tolerance of third-party reprisals would, no less than the tolerance of direct reprisals, deter persons from exercising their rights protected under Title VII." *Jackson v. Principi*, 2002 WL 517385 (E.E.O.C. Mar. 29, 2002). Accordingly, some courts have been prepared to go beyond the literal language of the statutes in order to further their underlying policy goals. *See McDonnell*, 84 F. 3d at 262 ("constru[ing] 'he has made a charge' to include 'he was suspected of having made a charge'" because "a literal interpretation of the provision would leave a gaping hole in the protection of complainants and witnesses," and would not "accomplish [the statute's] evident purpose," and further observing that a similar problem exists with respect to employers who resort to collective punishment); *Ohio Edison*, 7 F.3d at 545 (holding that "the phrase 'he has opposed any practice' should be construed broadly to mean 'he or his representative has opposed any practice,'" because a more restrictive

interpretation "would allow an employer to retaliate with impunity if someone engaged a representative to act on his behalf and would frustrate the Act's purpose to prevent retaliation for opposing unlawful employment practices"); *Gonzalez*, 122 F. Supp. 2d at 347 ("Although, strictly read, [the statute] provides a cause of action to the person who actually engaged in the protected activity . . . where a husband and wife work together, prohibiting the retaliated against spouse from maintaining an action would provide a means for an employer to circumvent Title VII's remedial scheme. Title VII should not be construed so narrowly.").

The Supreme Court has very recently discussed both the policy animating Title VII's retaliation provision, and the implications of that policy for interpreting the statute. In *Burlington Northern & Santa Fe Railway Co. v. White*, No. 05-259, 2006 WL 1698953 (June 22, 2006), the Court rejected an interpretation of the retaliation provision that would limit the kinds of harm that qualify as retaliation to actions directly related to employment. The Court explained its holding as follows:

> The anti-retaliation provision seeks to secure [a workplace free from prohibited discrimination] by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees.
>
> . . .
>
> An employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace. . . . A provision limited to employment-related actions would not deter the many forms that effective retaliation can take. Hence, such a limited construction would fail to fully achieve the anti-retaliation provision's primary purpose, namely, maintaining unfettered access to statutory remedial mechanisms.

*Id.* at *6-*7 (internal quotation marks omitted) (emphasis in original). Although the *Burlington* Court emphasized the importance of construing the provision so as to give effect to congressional purpose, it is important to note that the Court did not do so in the teeth of the provision's plain

language. To the contrary, the Supreme Court stressed the congruence between its view of the provision's purpose and the language Congress employed, and the primacy of statutory language in interpretation, pointedly noting that "purpose reinforces what language already indicates." *Id.* By contrast, the position advanced by Mrs. Mutts and adopted by the EEOC and some courts would require this Court to rewrite the plain language of the retaliation provisions to better achieve the basis of the perceived goals of the statute. In view of the tension between the statutory text and the EEOC's interpretation, the Court declines to defer to the EEOC's views. *See, e.g.*, *Smith v. City of Jackson*, 544 U.S. 228 (2005) ("[I]t is elementary that no deference is due to agency interpretations at odds with the plain language of the statute itself.") (internal quotation marks omitted).

To the extent that there is any tension between the language of the statute and the policy underlying it, the Court finds most persuasive the reasoning of the Third Circuit, which explained its decision to hew to the plain language of the statute as follows:

> This case . . . presents a conflict between a statute's plain meaning and its general policy objectives. In general, this conflict ought to be resolved in favor of the statute's plain meaning . . . The preference for plain meaning is based on the constitutional separation of powers – Congress makes the law and the judiciary interprets it. In doing so we generally assume that the best evidence of Congress's intent is what it says in the tests of the statutes.

*Fogleman*, 283 F.3d at 569. Although courts sometimes eschew blind adherence to a statute's literal language where the result would be absurd or contrary to clear legislative intent, *see, e.g.*, *Hayden v. Pataki*, 449 F.3d 305, 322-23 (2d Cir. 2006), that situation is not presented by this case for a number of reasons. First, as the Eighth Circuit observed, Congress indicated its awareness of the third-party problem by enacting provisions that "already offer[] broad protection to [third parties] by prohibiting employers from retaliating against employees for 'assist[ing] or participat[ing] in any manner' in a proceeding under Title VII." *Riceland Foods*, 151 F. 3d at 819 (quoting 42 U.S.C. §

18

2000e-3(a)).  Second, as the Third Circuit noted, there is an obvious reason for Congress to have chosen to limit protection to those third parties who actually assist or participate in a Title VII proceeding, namely "fear[] that expanding the class of potential anti-discrimination plaintiffs . . . to include anyone whose friends or relatives have engaged in protected activity would open the door to frivolous lawsuits." *Fogelman*, 283 F. 3d at 570.  In addition, the Court notes that under the capacious understanding of covered harms announced by the Supreme Court in *Burlington*, it seems possible that attempts by employers to chill protected activity by persecuting a complainant's associates on the workforce may be actionable as a harm to the person engaging in the protected activity, in this case Mr. Mutts himself, thus obviating the need for the kind of third-party claim advanced by Mrs. Mutts.

In sum, the Court concludes that since Mrs. Mutts' retaliation claim is based entirely upon the protected activity of her husband and not her own protected activity, she has failed to make out her *prima facie* case.  Accordingly, SCSU is entitled to summary judgment on Mrs. Mutts' Title VII retaliation claim.

## IV.

For the reasons explained above, the Court GRANTS Defendant's Motion for Summary Judgment [doc. # 27].  **The Clerk is directed to enter judgment for Defendant on all counts of the Complaint [doc. # 1] and to close this file**.

IT IS SO ORDERED.


/s/ _____Mark R. Kravitz_____
United States District Judge

**Dated at New Haven, Connecticut: June 28, 2006**.